Filed 7/13/23  In re S.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.L., et al. Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E080522 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J289595, J289596, J289597) |
| v. | OPINION |
| S.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Kristina M. Robb, County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Mother S.S. (Mother) appeals from a juvenile court order terminating her parental rights under Welfare and Institutions Code section 366.26,[1] to S.L. (2 years old), V.L. (4 years old), and T.L. (5 years old).  Mother contends the juvenile court erred in rejecting the beneficial parental relationship exception to adoption and terminating parental rights. We conclude there was no error and affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

On May 10, 2021, after Mother and her husband (Father) verbally argued, Father left with their three month old son, S.L.  Mother did not know where Father went with S.L.  Two days later, law enforcement told Mother and San Bernardino County Children and Family services (CFS) that S.L. had been found by the side of the street in a car seat. Father was located about a block away, under the influence of methamphetamine.  He admitted using methamphetamine a few days before.  Father was charged with child cruelty.

When interviewed by CFS, Mother said that, in addition to S.L., she had two other children , V.L. and T.L., by a different father, F.T.[2]  V.L. was three years old and T.L. was

_____

[1]  Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

[2]  Neither Father nor F.T. is a party to this appeal.

2

four years old. Mother admitted she had used methamphetamines with F.T. but claimed she quit when CFS previously became involved with her family. Mother reported that Father was on parole and had gotten out of prison about two weeks ago. He had been in prison for assault, domestic violence, and violating his parole.

CFS prepared a safety plan with Mother, in which she agreed not to allow Father to be around the children, and not to allow him to be alone with S.L. However, Mother indicated she wanted Father to have contact with S.L. Mother also agreed to address her substance abuse issues and obtain a restraining order against Father. Mother failed to comply with the recommendations outlined in the safety plan and allowed Father to be in her home while the children were present.

A. *Detention*

Because of concerns Mother was not protecting the children, the children were removed from Mother on June 18, 2021. On behalf of the children, CFS filed juvenile dependency petitions under section 300, subdivisions (b)(1) (failure to protect) and (g) (no provision for support).[3] The petition alleges a risk of harm and failure to protect the children based on Mother and Father (Parents) engaging in domestic violence, Parents abusing controlled substances, and Father and F.T. failing to provide support because their whereabouts were unknown.

---

[3] The three petitions are referred to in the singular as the "petition," as are subsequent documents and orders filed separately as to each child.

CFS reported in the detention report that Father had an extensive criminal history dating back to 2003 and mother had a 2017 charge for possession of drug paraphernalia. Mother also had a prior child welfare history, which included two unconfirmed cases, one in 2016 for drug abuse, relating to her older children who are not the subject of current dependency proceedings, and another referral in 2018, involving drug use and the family home roof collapsing onto T.L.

At the detention hearing in June 2021, the court ordered the children removed from their parents and ordered supervised visitation for the parents once a week for two hours.

B. *Jurisdiction/Disposition*

CFS reported in the jurisdiction/disposition report that Father's whereabouts were known but F.T.'s whereabouts remained unknown. As a result of the May 12, 2021 incident, Father was charged with child cruelty. Law enforcement reported Mother did not seem surprised or concerned about the incident or that S.L.'s whereabouts were unknown until he was found on the side of the road in his car seat. During CFS's interview of Mother on July 1, 2021, Mother said that Father was released from prison in 2020 for assault with a deadly weapon on a neighbor but the assault was actually on her. Mother also stated that when Father took S.L. on May 10, 2021, he was gone with S.L. for two nights. Father would usually take off with S.L. after arguing with Mother, and put S.L. in the car seat while Father would walk around. Mother denied the domestic violence allegations. She claimed that when she and Father argued, the children were

sleeping in a separate bedroom. Mother admitted having a history of methamphetamine use in 2015 and 2016, denied receiving treatment, and denied currently using methamphetamine.

CFS reported T.L. and V.L. had speech delays, ate inedible objects, and did not like to bathe. T.L. was diagnosed with autism spectrum disorder, was frequently angry, physically attacked V.L., had difficulty sleeping, threw objects, and hit himself. V.L. had extreme anger when told "no" and physically fought with T.L. S.L. was too young to determine if he had any developmental delays or behavioral issues.

When visiting T.L. and V.L. on July 2, 2021, Mother reportedly struggled to manage the children. CFS reported that it appeared that the children were not bonded with Mother. There were no concerns regarding Mother's separate visit with S.L. on July 6, 2021. F.T.'s whereabouts were still unknown.

At the jurisdiction/disposition hearing on July 14, 2021, the court declared the children dependents of the court and ordered reunification services for the parents.

C. *Six-Month Review*

CFS reported in the six-month status report filed on January 3, 2022, that on June 4, 2021, Father was convicted of willful cruelty to a child and sentenced to summary probation. On October 25, 2021, he was arrested for battery and violating the terms of his probation. On November 2, 2021, he pled no contest to battery and was placed back on probation. Father was currently in residential treatment. Mother was unemployed. F.T.'s whereabouts remained unknown.

5

Mother tested positive for methamphetamine in July and September 2021, and did not show up for testing on nine occasions. She also tested positive for methamphetamine on November 29, 2021, the day of intake for her outpatient care program.

Mother visited the children every Tuesday. During the visits, Mother brought food and overfed the children. T.L. would "stress-eat" so much that he would vomit. Mother fed V.L. cheese and milk even though she knew V.L. was lactose intolerant. Mother used profanity during the visits and smacked V.L. in the mouth with the front of her hand when V.L. whined, and told her to "shut up" three or four times. Mother said she could "flick" the child. Mother denied hitting her in the mouth but admitted "flicking" her on the mouth. When Mother told V.L. to take a timeout in the corner, V.L. ran under a chair and cried.

During a visit in September 2021, T.L. broke out in hives and defecated in his pants. When the visit ended, T.L. and V.L. ran to their caregivers' van, pushing and shoving to get in. The CFS notes for Mother's visits in August, September, and October 2021, stated that Mother told the children it was not her fault when they were upset, she brought junk food to the visits, she allowed T.L. to overeat, and she told V.L. she was disgusting and a "nasty ass" during two visits.

CFS reported that Mother and Father were participating in services but had made minimal progress in changing their behaviors. CFS noted that Mother was taking parenting classes and participating in counseling but "her behaviors during visitation with the children [were] very concerning. Mother has not appeared to have benefited from the

services she has completed. The mother is exhibiting inappropriate behaviors and interaction with the children."

T.L. was being evaluated for autism and was going to receive physical therapy and behavior modification services. He needed assistance with dressing, bathing, and brushing his teeth. V.L. had no medical or mental health issues. S.L. had motor skills developmental delays and was referred for physical therapy.

CFS reported in an additional information report that Mother completed 10 out of 12 parent education sessions, and completed anger management and domestic violence programs. She was enrolled in a substance abuse treatment program but her attendance was inconsistent and she had failed to show for testing.

At the six-month review hearing in February 2022, the court continued Mother's reunification services and terminated reunification services for Father and F.T. The court granted Mother supervised visits once a week for three hours.

D. *Twelve-Month Review*

CFS reported in its 12-month status review report in June 2022, that Mother and Father separated. CFS was concerned that Mother might be having a relationship with someone in jail who was incarcerated for involvement in a police pursuit and shooting at a deputy. Mother said she was only talking to the inmate and not dating him. During visits with the children, Mother reportedly made statements about her "'new daddy.'" After enrolling in outpatient treatment in November 2021, Mother drug tested negative in

December 2021, January 2022, February, March, April, and June 2022. Mother missed drug testing in May and July 2022.

Mother's visitation with the children was sporadic. She had not visited the children since April 22, 2022. She claimed she had had some medical issues which required treatment but she did not provide CFS with any substantiating documentation. CFS reported that during visits Mother called the children names, such as "'brat'" and "'cry baby'" and told the children to "'shut up.'" Mother continued to bring to visits dairy products and feed them to V.L. and S.L., even though she was aware they were lactose intolerant. CFS reported that "There does not appear to be a significant attachment between the children and the parents. There are concerns regarding the quality of the visits due to some inappropriate behaviors exhibited by the parents."

CFS reported in the visitation logs that there were concerns that during visits, when S.L. cried, Mother would tell him, "quit it" or "be quiet," and had forced him to go down a slide when he was scared, which made him cry even more. She then said she had had enough of his crying, put him in his stroller, and left him unsupervised. She forced the children to sit at a park table and watch a movie for an hour instead of letting them play. During a visit, S.L. became distressed when Mother picked him up and when she spoke to him. She reportedly was on her phone a lot during visits and became easily frustrated with the children. During another visit, she appeared irritated throughout the visit, glared at the children, and made nasty faces at them. During an April 2022 visit, she said she was in pain and did not interact with the children much.

8

The children were healthy, had made good progress in meeting developmental milestones, and had adjusted well to their placement and caregivers. The children had been placed together with Ms. H. and Ms. G. since August 19, 2021.

CFS reported in its July 2022, additional information report that Mother failed to drug test in June and July 2022, although she also had a negative drug test in June 2022.

At the contested 12-month review hearing in July 2022, the court found Mother had made minimal progress, her drug testing and visitation were inconsistent, and the court had significant concerns with her visits. The court terminated Mother's reunification services, scheduled a section 366.26 hearing, and granted Mother supervised visits twice a month for two hours.

E. *Section 366.26 Hearing*

CFS reported in its section 366.26 hearing report filed in November 2022, that the children were physically healthy and making good progress in their placement with Ms. H. and Ms. G. Mother was not consistent with her visits and often failed to confirm or show up for visits. The caregivers were committed to caring for the children on a permanent basis. The caregivers and children were strongly bonded.

In November 2022, Mother filed a section 388 petition seeking reinstatement of services based on her entry into inpatient treatment. Mother reported she was not in a relationship. The court summarily denied her section 388 request.

In December 2022, CFS reported that supervised video visits for Mother were scheduled on Fridays for two hours. Her last visit was November 6, 2022. Mother was still in her recovery program.

At the section 366.26 hearing on December 15, 2022, Mother testified she had a bond with the children and objected to termination of her parental rights. Mother stated that in 2021 through June 27, 2022, she visited the children every week, and after that, visited bi-weekly. According to Mother, she had four in-person visits during the period from June through October 2022. The children ran to her, called her "Mom," and gave her hugs and kisses. Mother testified that, after enrolling in her in-patient program, she visited the children once "because they have sports and other stuff and I'm not going to sit them here and try to get them out of their sports to just sit on the phone." Mother also explained she had a long recovery program schedule, which made it difficult to accommodate visits.

The court found that the children were adoptable, found no exceptions to adoption applied, ordered adoption as the permanent plan, and terminated parental rights.

III.

DISCUSSION

Mother contends the court erred when it found the beneficial parental relationship exception to adoption did not apply and terminated parental rights.  We conclude there was no such error.

A. *Applicable Law*

After the juvenile court terminates a parent's reunification services, "'the focus [of the proceedings] shifts to the needs of the child for permanency and stability.'"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  Adoption then becomes the preferred permanent plan for the child.  Section 366.26 requires the juvenile court to terminate parental rights if it finds by clear and convincing evidence that the child is likely to be adopted.  (§ 366.26, subd. (c)(1).)  A parent may avoid termination of parental rights, however, if the parent establishes an exception to adoption.  (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).)

One such exception is the beneficial parental relationship exception.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631; § 366.26, subd. (c)(1)(B)(i).)  To establish the exception, the parent bears the burden of proving, by a preponderance of evidence, three elements:  (1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) the existence of a substantial, positive, emotional attachment between the child and the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and (3) that terminating the parent–child

11

relationship would be detrimental to the child even when balanced against the countervailing benefit of a new adoptive home. (*Caden C.*, *supra*, at p. 636; § 366.26, subd. (c)(1)(B)(i).)

In *Caden C.*, the California Supreme Court explained that the statutory language of the beneficial parental relationship exception, "along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)

In determining if the beneficial parental relationship exception applies, "the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's

beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634, italics omitted.)

The court clarified in *Caden C.* that a parent's failure to make adequate case-plan progress or to address the issues that led to the child's dependency, while relevant, is not a categorical bar to establishing the exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-638.) The critical question is whether the child's relationship with his or her parent is so significant that it outweighs the benefits of adoption, not whether the parent has satisfactorily addressed the issues that led to dependency proceedings. (*Id*. at pp. 635-636.)

In understanding these elements, we are guided by the seminal decision interpreting the exception, *In re Autumn H.* (1994) 27 Cal.App.4th 567. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) "What the appellate court emphasized in *Autumn H.* is a crucial aspect of the trial court's responsibility in these cases: in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. (See *In re Autumn H.*, *supra*, at p. 575.) By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.)

"When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption. (See § 366.26, subd. (c)(4)(A).)" (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

B. *Standard of Review*

The juvenile court's findings on the first two elements—regular visitation and whether the child would benefit from continuing the relationship—are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Courts review the third element using a hybrid standard: reviewing factual determinations for substantial evidence and the weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion. (*Ibid*.)

Where, as in this case, the mother contends that the juvenile court erred in rejecting the beneficial parental relationship exception, we must determine whether the evidence compels a finding in favor of mother as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.*, *supra*, at p. 1528.)

C. *Analysis*

Substantial evidence supports the juvenile court's finding that Mother did not meet the first requirement of consistent visitation with the children. At the beginning of the juvenile dependency proceedings, during the first six-months, she consistently visited the children once a week. Thereafter, Mother's visitation became sporadic and she did not visit the children for a month. Mother claimed this was because she had health issues but Mother did not provide CFS with any supporting documentation. In June 2022, Mother missed a visit, which she claimed was because she did not know she had to confirm the visit beforehand. Mother also ended early another visit in July 2022. CFS reported in its November 2022, that Mother's visitation remained inconsistent and she often failed to show up for visits or confirm she intended to attend visits.

During testimony at the section 366.26 hearing in December 2022, Mother acknowledged her visitation was inconsistent. Although her visits were scheduled to be biweekly, she visited the children in person only four times out of 10 scheduled visits, from June through October 2022. Beginning in October, after Mother entered her in-patient program, she was only able to visit by video. During that time, until the section 366.26 hearing in December 2022, she only had one video visit. We conclude Mother has not met her burden of establishing consistent visitation.

There is also insufficient evidence establishing the second element of the beneficial parental relationship exception; that the children would benefit from continuing their relationship with Mother. (§ 366.26, subd. (c)(1)(B)(i)). The court in

15

*Caden C.* states regarding the second element that "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] As the trial court and Court of Appeal did here, courts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Mother argues that guardianship, rather than adoption, was more appropriate because the children had a substantial, positive emotional attachment to her. But substantial evidence does not support such a finding. The children were young when removed from Mother. S.L. was four months old, V.L. was two years old, and T.L. was four years old. The portion of the children's lives spent in Mother's custody was short. At the time of the section 366.26 hearing, the children had been placed three times and had been in foster care for a year and a half. They had lived with their current caretakers, Ms. H. and Ms. G., since August 19, 2021, and were doing well in their placement. The children and their caretakers had bonded and the caretakers were willing to provide a permanent home for the children.

The evidence disclosed that Mother's visits often had a negative effect on the children. All visits were supervised, including the video call visitation. During many of

16

the visits, she brought the children unhealthy food and overfed them, resulting in T.L. vomiting. She also fed V.L. and S.L. dairy foods, even though she knew they were lactose intolerant and dairy food made them sick.

There was also evidence Mother had difficulty managing the children, she became easily irritated with them, and she did not appear to be bonded with them. Mother used profanity during visits, called the children names, such as "brat," "nasty ass," "cry baby," and "disgusting." She told them numerous times to "shut up" and smacked V.L. in the mouth, causing her to hide under a chair and cry. After disruptive interaction between Mother and Father in the children's presence at the beginning of one visit, T.L. broke out into hives and defecated on himself. After the visit, the children fled to their caregivers' van, pushing and shoving to get in.

We conclude the evidence in the record shows that, even though Mother testified the children ran to her at the beginning of visits, hugged and kissed her, and called her "Mom," much of Mother's interaction with the children was negative, harmful, and problematic. There was substantial evidence supporting the juvenile court's finding that Mother and the children did not have a substantive positive emotional attachment.

There is also insufficient evidence as to the third factor; that terminating the parent–child relationship would be detrimental to the children even when balanced against the countervailing benefit of a new adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636; § 366.26, subd. (c)(1)(B)(i).)

17

The court in *Caden C.* states as to the third element that "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also *id.*, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life. . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet as the experts in this case discussed, a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Thus, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

Here, the children were young when they were removed from Mother and had been living with their current caretakers in a stable home environment for 14 months. They were bonded to their caretakers and making progress with their developmental and behavioral issues. Mother has not demonstrated that the children would be detrimentally affected by severing their relationship with her, whereas the record demonstrates that the children would benefit from the stability of being adopted by their caretakers. There was

18

evidence the children and Mother were not closely bonded. Mother's visits were supervised and were for only two to three hours a week, at most.

During visits, Mother was easily irritated by the children's behavior, resulting in Mother calling the children names, hitting them, and telling them to "shut up." Mother's conduct feeding the children dairy and junk food, and overfeeding them, making them sick, did not seem to concern Mother, because she continued such detrimental conduct, even though she knew it was inappropriate and harmful. In addition, there was one visit that had been particularly traumatizing, in which the children fled to their caretaker's van at the end of the visit as quickly as they could. Evidence showed that at some of the visits the children were uncomfortable, anxious, and unhappy. There is no evidence that the children expressed any desire to live with Mother.

As noted in *In re A.L.* (2022) 73 Cal.App.5th 1131, 1157, in assessing potential detriment, it was proper for the juvenile court to consider the nature of the caregivers' and Mother's relationships with the children. The Supreme Court acknowledged in *Caden C.* that "[i]n many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.) Thus, the strength and quality of Mother's relationship with the children "is a relevant consideration to the court's detriment finding." (*In re A.L., supra*, at p. 1157.)

Even assuming the children were bonded with Mother, Mother has not established that such bond was strong enough to outweigh the benefit of the children being adopted. We conclude Mother therefore has not met her burden of demonstrating that severing her relationship with the children would deprive the children of a substantial, positive emotional attachment and would harm the children. (See *Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1153 ["The burden is on the parent to prove the parental-benefit exception by a preponderance of the evidence."]) Under such circumstances, the juvenile court did not err in rejecting the beneficial parental relationship exception and terminating parental rights.

IV.

DISPOSITION

The order on December 15, 2022, terminating Mother and Father M.'s parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:

<u>MILLER</u>
Acting P. J.

<u>MENETREZ</u>
J.

20